DOWNEY BRAND LLP
WILLIAM R. WARNE (Bar No. 141280)
bwarne@downeybrand.com
MICHAEL J. THOMAS (Bar No. 172326)
mthomas@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:    916.444.1000
Facsimile:    916.444.2100

Attorneys for Plaintiff, INTERLINK
PRODUCTS INTERNATIONAL, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| INTERLINK PRODUCTS INTERNATIONAL, INC., a New Jersey Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>DREW BOHAN, both in his personal capacity and in his official capacity as Executive Director of the California Energy Commission; MAUNEE SANCHEZ, both in her personal capacity and in her official capacity as Director of Compliance Assistance and Enforcement of the California Energy Commission,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT FOR: DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF, 28 U.S.C. §§ 2201 and 2202; VIOLATION OF 42 U.S.C. § 1983**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff INTERLINK PRODUCTS INTERNATIONAL, INC. ("Plaintiff" or "Interlink"),

by and through its counsel, for its Complaint against Defendants DREW BOHAN and MAUNEE

SANCHEZ, in their respective personal and official capacities (collectively, "Defendants"),

alleges as follows:

/ / /

/ / /

/ / /

4511800

1

COMPLAINT

## I.  __INTRODUCTION__

1.  Defendants are engaged in an ongoing violation of federal law and abuse of power at the expense of Interlink, a private entity.  In particular, Defendants, who are employed by the California Energy Commission (CEC), an agency of the State of California, have targeted Interlink for alleged wrongdoing and are utilizing disproportionate, dishonest, and abusive tactics far in excess of their regulatory authority.  Defendants have done so and are continuing to do so in retaliation for Interlink's exercise of its First Amendment rights to legally challenge the CEC.  Their abusive conduct reaches far beyond the borders of the State of California and is punitively and wrongfully interfering with Interlink's pursuit of lawful commerce in and from New Jersey.

2.  Founded in New Jersey in 1996, Interlink specializes in developing, producing, and marketing innovative bath and shower products, including best-selling brands such as Hydroluxe, AquaDance, and Hotel Spa.  Interlink distributes these products both through retail outlets and online platforms.

3.  Tasked with overseeing California's energy policies, the CEC is responsible for implementing appliance efficiency regulations.  Although the CEC's official mission is to promote environmental sustainability and energy efficiency within the State of California, its employees' practices at issue in this matter have strayed from the CEC's responsibilities.  Rather than addressing genuine efficiency violations, Defendants have chosen to abuse their regulatory authority to intimidate those who have chosen to exercise their constitutional right to contest the manner in which Defendants have attempted to use their power, as evidenced by their actions against Interlink.

4.  In 2020, Defendants sent their first written communication to Interlink, therein alleging Interlink's showerheads violated California Public Resources Code section 25402(c)(1)(A)(i) (the "Statute") and its accompanying appliance efficiency regulations, namely, Title 20, Division 2, Article 4 of the California Code of Regulations sections 1601–09, which govern showerhead flow rates, labeling, and registration requirements.  In this letter, Defendants purported that Interlink was somehow subject to California's regulatory control, despite both the Statute and its regulations limiting the CEC's enforcement authority to products sold or offered for

2

sale in California, and the showerheads at issue being sold and shipped entirely outside of California's borders.

5. Later that same year, as was its right, Interlink filed a lawsuit against the CEC and the State of California to legally contest the CEC's ability to enforce the aforementioned regulations under the Commerce Clause of the U.S. Constitution (the "Lawsuit"). In response, Defendants launched a campaign of retaliation against Interlink.

6. For instance, Defendants have contacted all of Interlink's major retail customers, including Amazon, Walmart, Home Depot, and Lowe's, and threatened to bring enforcement actions against these companies. On information and belief, Plaintiff believes Defendants have done so to punish Interlink for its earlier decision to exercise its First Amendment right to petition the government. These threats by Defendants, as directed to Interlink's customers, have damaged Interlink. Indeed, in response to Defendants' demand letters, these retailers have removed Interlink's products from their websites, and/or blocked sales into California, and/or suspended future purchases of Interlink products.

7. Defendants also threatened Interlink directly, sending Interlink multiple Notices of Violation and demanding a settlement in excess of 3 million dollars, an amount exponentially higher than those settlements the CEC has reached with Fortune 100 companies like HP, Dell, Amazon, and Home Depot.

8. The Defendants' threats and actions are retaliatory. They have targeted Interlink and its customers alone, despite knowing that other out-of-state companies also offered noncompliant products to California residents through these same retailers. On information and belief, Plaintiff alleges that Defendants have singled-out Interlink for disproportionate and abusive enforcement tactics because Interlink was the only company to legally challenge the CEC's otherwise unchallenged authority.

9. Indeed, until recently, the CEC's practice of retaliation was plainly stated in its regulations, which provided for harsher treatment of entities that did not cooperate with the CEC, without regard for whether an entity had legitimate justification for its noncooperation.

/ / /

4511800

3

COMPLAINT

Retribution in response to any challenge to CEC authority was thus the official modus operandi of the agency.

10.    But the fundamental right to petition the government is enshrined in our U.S. Constitution, which prohibits the very type of retaliation Defendants have visited upon Interlink.

11.    Defendants' abuse of power and retaliatory conduct is made worse by the fact that the Ninth Circuit Court of Appeals ultimately confirmed that Interlink's reading of the operative statute was correct and the CEC's was wrong.  In particular, since filing its 2020 lawsuit to challenge the CEC's authority, case law established that the CEC's enforcement of its regulations had no application to sales of Interlink's products on the internet, whether directly by Interlink or through retailers, for all sales occurring before 2023.  *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107 (9th Cir. 2022) (Hereinafter "*Canards*").

12.    Indeed, in *Canards*, the Ninth Circuit held that the statutory phrase "sold in California" does not apply to internet sales involving goods that are not located in California at the time of sale.  In 2023, in response to the Ninth Circuit's decision, the California Legislature chose to amend the Statute in an effort to extend the reach of CEC's authority to cover out-of-state internet sales.

13.    In retaliation for Interlink's use of the legal system, Defendants have now pivoted, arguing incorrectly that Interlink's inclusion of flow-boost kits for certain showerheads allegedly violates CEC regulations.  Fortunately, Interlink also enjoys a First Amendment right to communicate the truth to its customers regarding these flow-rate kits, and the Defendants' attempt to stop such communication through harassment further exposes its retaliatory intent and its violation of Interlink's rights under the First Amendment.

14.    Through this lawsuit, Interlink seeks a declaration from this Court, stating: (1) as found by the Ninth Circuit in *Canards*, prior to 2023, the CEC's regulations did not apply to sales of Interlink products that were not located in California at the time of sale, whether those sales were made directly or through retailers; (2) that Interlink's flow-boost kits do not violate any applicable CEC regulation; and (3) that Defendants unlawfully retaliated against Interlink in violation of Interlink's First Amendment rights to petition the government and lawfully

4

COMPLAINT

DOWNEY BRAND LLP

communicate with its customers.  Further, Interlink seeks injunctive relief to prohibit further retaliation, and, finally, Interlink seeks damages for lost profits, loss of goodwill, and harm to its business reputation.

## II.    PARTIES

15.    Interlink is a New Jersey corporation with its principal place of business at 1315 East Elizabeth Avenue, Linden, New Jersey 07036.  All of Interlink's offices and business facilities are and have always been located in New Jersey.

16.    On information and belief, Drew Bohan is the Executive Director of the CEC, whose business address is located in Sacramento, California.  Mr. Bohan is the highest ranking official within the CEC and directs the activities of the CEC and its representatives.

17.    On information and belief, Maunee Sanchez is the Director of Compliance Assistance and Enforcement at the CEC, whose business address is located in Sacramento, California.  Ms. Sanchez is the highest ranking official within the CEC's Office of Compliance Assistance and Enforcement and participated in, directed, and/or was responsible for the retaliatory practices of the CEC that are the subject of this Complaint.

## III.    JURISDICTION AND VENUE

18.    The Court has jurisdiction under 28 U.S.C. § 1331 as this action arises under 42 U.S.C. § 1983, a federal statute.  In addition, this Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a), as these claims form part of the same case or controversy under Article III of the United States Constitution.  Specifically, the state law claims are so related to the federal claims arising under 42 U.S.C. § 1983 that they derive from a common nucleus of operative fact.  The exercise of supplemental jurisdiction promotes judicial economy, convenience, and fairness to the parties, as it will allow for the resolution of all claims in a single forum.

19.    This Court is authorized to provide declaratory and injunctive relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Thus, this Court has jurisdiction to order prospective relief in the form of a declaratory judgment and an injunction

/ / /

against Defendants to end their unlawful harassment campaign against Interlink led by these CEC officers acting in their official capacities as officers of a State of California agency.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants maintain their office in Sacramento, California, which is within this District.  Further, venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District, including Defendants' continuous correspondence with Interlink.

21.    No exhaustion requirements apply to Interlink on the claims and facts alleged in this Complaint.

## IV.    LEGAL BACKGROUND

### A.    Relevant Statutory and Regulatory Framework

22.    Pursuant to the Warren-Alquist State Energy Resources Conservation and Development Act (California Public Resources Code sections 25000 *et seq*.), the California Legislature granted the CEC authority to regulate energy conservation and development. Specifically, the Statute at issue, Public Resources Code section 25402(c)(1)(A)(i), grants the CEC the power to "prescribe, by regulation, standards for minimum levels of operating efficiency … that will reduce the energy or water consumption growth rates."  Cal. Pub. Res. Code § 25402(c)(1)(A)(i).

23.    Based on this authority, the CEC promulgated Title 20, Division 2, Article 4 of the California Code of Regulations and, more specifically, section 1605.3(h)(5) (the "Flow Rate Regulation"), which states in relevant part: "The flow rate of showerheads shall be not greater than … 2.0 gpm at 80 psi [for showerheads manufactured on or after July 1, 2016 and prior to July 1, 2018], and 1.8 gpm at 80 psi [for showerheads manufactured on or after July 1, 2018]."  20 C.C.R. § 1605.3(h)(5).  The CEC also adopted additional regulations for labeling and product registration requirements. *Id.* at §§ 1601–09.

24.    Importantly, until January 1, 2023, the Flow Rate Regulation, along with all other CEC regulations, applied only to showerheads "sold or offered for sale in the state [of California]."  The Flow Rate Regulation did not define this phrase further; nor did the Statute.

**B.      The Statute's January 1, 2023 Amendment**

25.      In June of 2022, the California Legislature voted to amend the Statute, creating an important amendment that would become law as of January 1, 2023.  The purpose of the Legislature's amendment was to add the following relevant language to the Statute: "'Sold or offered for sale in the state means any sale of or offer to sell an appliance for end use in the state, regardless of the seller's physical location, and includes, without limitation, internet, telephone, and mail order transactions.  For purposes of this section, the Uniform Commercial Code-Sales (Division 2 (commencing with Section 2101) of the Commercial Code) does not define 'sold or offered for sale' or determine where sales or offers for sale occur."  Cal. Pub. Res. Code § 25402(c)(1)(A)(i) ("2023 Amendment").

26.      A recap of the year leading up to the 2023 Amendment reveals the purpose behind the Statute's revised language.  In 2022, the Ninth Circuit in *Canards*, 33 F.4th 1107 determined that out-of-state foie gras sellers – *who sold into California via the internet* – were not subject to a California sales ban prohibiting certain products from being "sold in California."  33 F.4th at 1121–22 (analyzing California Health and Safety Code section 25982: "A product may not be sold in California if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size.").

27.      The Ninth Circuit plainly found that, in the absence of a definition for the phrase "sold in California," the Uniform and California Commercial Codes apply, and therefore, "the question is not where the seller is located but where a sale occurs."  *Id.* at 1121.  Under the Uniform and California Commercial Codes, as well as California case law, a sale occurs where title passes.  *Id.*  Sellers dealing in products out-of-state, who reach California consumers via the internet, pass title outside of California.  Their products are not sold "in California" nor are they offered for sale "in California" and, therefore, those products are not subject to the state's sales ban.

28.      In response to the Ninth Circuit's holding, the California Legislature changed the Statute.  The California Assembly Committee on Utilities and Energy, at a June 29, 2022, hearing, even acknowledged that the change was due to *Canards*: "The Ninth Circuit recently relied on the

4511800
7
COMPLAINT

UCC definition of a sale in its consideration of the foie gras.  This bill clarifies that the UCC definition is not applicable to the sale of Title 20 appliances …"  Thus, the 2023 Amendment's purpose was transparent: the Legislature voted to amend the Statute to overcome the Ninth Circuit's decision in *Canards*, thereby granting Defendants the authority to regulate online sales in to California, regardless of where title passes.

### V.      FACTUAL BACKGROUND

**A.      Interlink's Lawsuit Against CEC**

29.      On or about February 26, 2020, Interlink received a written communication from Defendants notifying it of purported violations of California's Appliance Efficiency Regulations with respect to the sale of two Interlink showerheads: Hydroluxe model 1433 and AquaDance model 4328 ORB.  Specifically, Defendants alleged these showerheads did not comply with California's flow rate, labeling, and product registration requirements.  *See* 20 C.C.R. §§ 1605.3(h)(5), 1608(a)(1), 1607(b).

30.      On or about April 6, 2020, Defendants contacted Interlink again and threatened "administrative or civil litigation, contacting retailers, and blocking sales of the illegal products" if Interlink failed to promptly respond.  On or about April 20, 2020, Interlink responded by asking Defendants to provide the grounds for Interlink's alleged noncompliance.  Without explaining their basis, Defendants conclusively stated the regulations applied to Interlink, and that Interlink was in violation of such.

31.      On June 23, 2020, in response to Defendants' lack of transparency, Interlink filed its Lawsuit against the State of California in the United States District Court for the District of New Jersey.  The Lawsuit alleged that the CEC's regulations, as applied to Interlink as an out-of-state internet seller with no physical presence in California, violated the Commerce Clause of the U.S. Constitution.

32.      On or about November 16, 2020, the Lawsuit was transferred to the United States District Court for the Eastern District of California, and, on or about June 23, 2021, the Lawsuit was stayed pending the Ninth Circuit's decision in *Canards*.  Because the Ninth Circuit ultimately found no dormant commerce clause violation, and that was the sole basis for Interlink's lawsuit at

DOWNEY BRAND LLP

the time, the district court dismissed Interlink's claim. In its order dismissing Interlink's case, the district court took judicial notice of the Statute's 2023 Amendment, but expressly declined to rule on the issue of whether the CEC's regulations prior to 2023 applied to Interlink's products.

**B.    CEC's Retaliatory Enforcement Efforts**

33.    Following Interlink's decision to bring its Lawsuit against the CEC, Defendants began a retaliatory campaign against Interlink and its retail customers.

34.    Defendants contacted Amazon and falsely alleged that Interlink's Hydroluxe brand showerheads violated CEC regulations and were thus illegal to sell in California. Defendants also demanded that Amazon block sales of Interlink's products to California residents and demanded Interlink sales data dating back to 2015. In response, Amazon immediately blocked and ceased sales of Interlink's showerheads into California.

35.    Defendants contacted Home Depot and falsely alleged that Interlink's AquaDance and Hydroluxe brand showerheads violated CEC regulations. On information and belief, Defendants also demanded that Home Depot block sales of Interlink's products to California residents and demanded Interlink sales data dating back to 2015. In response, Home Depot immediately blocked and ceased sales of Interlink's showerheads into California.

36.    Defendants contacted Lowe's and falsely alleged that Interlink's showerheads violated the CEC's regulations. On information and belief, Defendants also demanded that Lowe's block sales of Interlink's products to California residents and demanded Interlink sales data dating back to 2016. In response, Lowe's restricted Interlink sales into California.

37.    Defendants contacted Walmart and falsely informed Walmart that Interlink's products violated the CEC regulations, asked for Interlink sales data dating back to 2016, and demanded that Walmart block sales of Interlink's products to California residents. In response to Defendants' improper enforcement efforts, Walmart restricted and blocked Interlink products for sale in California.

38.    Some of Interlink's products that Defendants identified as purportedly violating CEC showerhead flow-rate regulations were not showerheads and some did not even use water.

/ / /

DOWNEY BRAND LLP

4511800

9

COMPLAINT

39.    When Defendants issued notices of violation with respect to Interlink to Amazon, Home Depot, Lowe's, and Walmart, on information and belief, Defendants were aware that there were numerous products of other sellers on those platforms with the same allegedly noncompliant characteristics as Interlink's showerheads.  Yet, on information and belief, Defendants singled out Interlink's showerheads.  Defendants did not ask and, on information and belief, have never asked those retailers to institute platform-wide blocks on products not meeting the CEC's supposed requirements.  Defendants were happy to ignore all of those other sellers – representing literally thousands of showerhead products – for the sake of retaliating against Interlink when Defendants could have prevented the sales of all of those showerheads to California residents with a simple request to each of those retailers.

40.    On information and belief, Defendants did not ask these retailers for platform-wide accounting of allegedly noncompliant sales, just an accounting for Interlink's products.

41.    On information and belief, Defendants failed to request platform-wide restrictions on sales to California residents even after Interlink pointed out that Defendants could easily do so, and even after Interlink complained of the unfairness of having just its products blocked while others plainly continued to sell their products to California residents.

42.    On information and belief, Defendants targeted Interlink's products to the exclusion of others out of spite and in retribution for Interlink's suing the CEC, criticizing the CEC's enforcement practices, and otherwise challenging the CEC's authority to enforce its regulations beyond their scope.

43.    In September 2023, Defendants contacted Walmart and misrepresented that Interlink's AquaCare Model 1639 showerhead was absent from the CEC compliance database, and thus noncompliant with CEC regulations, even though this product was in fact registered in the relevant database.  Because of Defendants' misrepresentations, Walmart suspended purchases of the AquaCare Model 1639; before doing so, the AquaCare Model 1639 was the bestselling showerhead in America.

/ / /

/ / /

4511800

10

COMPLAINT

44.    But Defendants went beyond simply targeting Interlink's retailers. They also began singling out Interlink's compliance certification filings for rejection, thereby further interfering with Interlink's ability to sell to California consumers.

45.    Further, on or about September 26, 2023, Interlink discovered that Defendants interfered with Interlink's business by delaying Interlink's compliance certifications. Specifically, on information and belief, Defendants were "manually reviewing" Interlink products for compliance, which meant Interlink's product submissions took far longer than what was normal for issuing certifications.

46.    In a letter dated June 3, 2024, Interlink informed the CEC of the Defendants' improper enforcement techniques and warned the CEC of Interlink's intent to take further legal action if Defendants did not cease their unlawful conduct. In response, Defendants retaliated further. Specifically, in an effort to coerce Interlink into accepting its settlement demand, Defendants contacted Walmart, Home Depot, and Lowe's on June 26, 2024, and falsely reported to these companies that numerous Interlink products were sold in violation of California regulations and threatened each company with enforcement action.

47.    In their June 26, 2024 communications, Defendants also made exorbitant settlement demands to Walmart, Home Depot, and Lowe's. These settlement demands were made to further damage Interlink's relationships with its customers, further retaliate against Interlink for Interlink's legal challenges, and further suppress Interlink's First Amendment rights by coercing Interlink into capitulating without further legal challenge. In response to these threats, both Walmart and Home Depot suspended sales of Interlink's products, and Lowe's froze payments to Interlink.

48.    Defendants' settlement demand of Interlink in excess of 3 million dollars is also a blatantly retaliatory action, not only for Interlink's having challenged the CEC's authority, but for Interlink's exercise of its First Amendment right to lawfully convey truthful information regarding its products.

/ / /

/ / /

DOWNEY BRAND LLP

4511800

11

COMPLAINT

49.     Interlink's 1.8 gallons per minute (gpm), California-compliant showerheads are often purchased by customers who live outside of California, where the flow-rate limit is 2.5 gpm. For some of those products, Interlink provided customers with information regarding replacement of the 1.8 gpm flow restrictors (which were pre-installed in the products) with 2.5 gpm restrictors.

50.     Providing such information for the products in question is not prohibited by any law and helps ensure that customers outside of California who purchase the 1.8 gpm products without realizing they are purchasing a lower-flow showerhead are aware they have the option of increasing the flow rate to the 2.5 gpm federal standard.

51.     It is also legal for consumers within California or anywhere else in the United States to remove flow restrictors from their showerheads at any point in time after purchase, and there is no law against informing them of their right to do so.

52.     Defendants took issue with Interlink's exercise of its right to convey truthful and lawful information regarding increasing flow rate to its customers, expressing open hostility and contempt for Interlink based on its conveyance of this information with the above-referenced products.

53.     In addition to demanding over 3 million dollars in settlement for sales of products *Canards* had confirmed were not subject to the CEC's regulations, Defendants also demanded that Interlink cease providing customers with instructions for replacing flow restrictors or advertising that customers could do so.

54.     Defendants have persisted in this demand, which is aimed at suppressing Interlink's free and lawful speech, in violation of federal law.

55.     Defendants' open contempt for Interlink and their efforts to damage Interlink's relationships with its customers in retaliation for Interlink's exercise of its First Amendment rights was likewise on full display during a recent call between CEC representatives and Interlink.

56.     In scheduling the call at Interlink's request, CEC's representatives claimed that they agreed to have the call for the express purpose of discussing how to potentially resolve the longstanding dispute between Interlink and the CEC.

/ / /

4511800

12

COMPLAINT

57.     On information and belief, the CEC's representatives' true intent was to embarrass Interlink in front of its customer, Walmart, in further retaliation for Interlink's exercising its legal rights.

58.     The CEC invited Walmart to participate in the call and made sure that its representatives had the Zoom dial-in information to join, despite the fact that their participation was unnecessary.

59.     When it came time for the call, and Interlink invited discussion of the issues pertinent to a potential resolution, the CEC's attorney immediately became belligerent, yelling and refusing to allow Interlink's representatives to speak, much less discuss a path to settlement.  Then he abruptly ended the call, essentially hanging up on Interlink's representatives mid-sentence.

60.     On information and belief, Defendants' disproportionately heavy-handed, unreasonable, and inequitable conduct toward Interlink is and at all times has been motivated, in whole or in part, by Defendants' desire to punish Interlink for filing its original lawsuit, criticizing the CEC, challenging the CEC's authority, and lawfully conveying truthful information to customers.

61.     On information and belief, Defendants have not treated other targets of enforcement with anything approaching the harshness they have displayed with respect to Interlink, as reflected, for example, in the disparity between the CEC's historical settlements with alleged violators and Defendants' settlement demand of Interlink.

62.     Defendants issued their settlement demand of over 3 million dollars to Interlink and continued to employ their abusive conduct toward Interlink and its customers after the Ninth Circuit had already vindicated Interlink's position with respect to the scope of the regulations.

63.     Defendants are so fixated on retribution against Interlink that they have, on information and belief, ignored egregious intentional violations of CEC regulations for the sake of dedicating resources to their vindictive pursuit of Interlink.

64.     As a direct result of Defendants' illegal and unconstitutional conduct in violation of federal law, Interlink has suffered substantial lost profits, loss of goodwill, and harm to its business reputation at an amount to be proven at trial.

DOWNEY BRAND LLP

## VI.    CLAIMS

### FIRST CAUSE OF ACTION

**(Retaliation in Violation of U.S. Const. amend. I; 42 U.S.C. § 1983)**

65.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 64, inclusive, of this Complaint and by reference thereto incorporates the same herein as though set forth in full.

66.    Defendants acted under color of state law with regard to the conduct alleged in this Complaint.  Defendants, as CEC employees acting in their official capacities, "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Adkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

67.    Interlink engaged in a constitutionally protected activity when it filed the Lawsuit against the State of California to obtain a judicial declaration that the Regulation violated the Commerce Clause in *Interlink Prods. Int'l, Inc. v. Crowfoot*, 678 F.Supp.3d 1216 (E.D. Cal. 2023).  Indeed, the First Amendment provides that "Congress shall make no law … abridging … the right of the people … to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The U.S. Supreme Court has recognized this right as one of "the most precious of the liberties safeguarded by the Bill of Rights."  *Mine Workers v. Ill. Bar Assn.*, 389 U.S. 217, 222 (1967).

68.    The right to petition extends to the courts and, therefore, includes the right to file a lawsuit against the government.  *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) ("The right of access to the courts is subsumed under the [F]irst [A]mendment right to petition the government for redress of grievances.").  Any "intentional obstruction of the right to seek redress 'is precisely the sort of oppression that … section 1983 is intended to remedy.'" *Id*. (quoting *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).  Thus, by seeking legal redress against the CEC, Interlink satisfies the first element of its retaliation claim.

69.    Interlink also engaged in a constitutionally protected activity when it lawfully conveyed information to its consumers regarding its showerheads' 2.5 gpm flow-boost kits.

DOWNEY BRAND LLP

4511800

14

COMPLAINT

Interlink, a corporation, enjoys a First Amendment right to free speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) ("The Court has recognized that First Amendment protection extends to corporations.")  This right undoubtedly includes the right to convey lawful, truthful information to Interlink's customers.

70.    Defendants' conduct following Interlink's filing of the Lawsuit would chill a person of ordinary firmness from continuing to engage in the aforementioned constitutionally protected activities.  After Interlink filed the Lawsuit, Defendants sent multiple letters to Interlink's major retail customers – many containing objectively false information – threatening enforcement penalties if these retailers did not remove Interlink's products for sale.  Defendants' harassment campaign has caused Interlink substantial damage as these retailers bowed to Defendants' pressure and either removed Interlink's products, suspended future showerhead purchases, or discontinued future private-supplier business relationships with Interlink.

71.    Additionally, Defendants have sent Interlink multiple Notices of Violation, as well as a settlement demand in excess of 3 million dollars.  These accrued penalties, in combination with substantial lost profits and the substantial harm Defendants' illegal conduct has caused to Interlink's reputation, most definitely would "chill a person of ordinary firmness" from continuing to exercise their constitutional rights – especially considering the extensive length of Defendants' harassment campaign.

72.    Interlink's original lawsuit was and remains a substantial motivating factor in Defendants' misconduct and harassment.  On information and belief, Defendants did not send a single letter to any of Interlink's retailers until one month after Interlink filed the Lawsuit.

73.    It is also clear that, as a result of Interlink's legal challenge, Defendants are treating Interlink differently than other showerhead manufacturers.  Indeed, on information and belief, each of the communications sent by Defendants to Interlink's retail customers singled out only Interlink's products as noncompliant.  On information and belief, Defendants did not threaten enforcement penalties as to any other showerhead brands, despite other showerhead brands containing the same features that Defendants find "noncompliant" and "illegal" when it pertains to Interlink.

4511800

15

COMPLAINT

74.     In these communications, on information and belief, as a method of retaliation against Interlink, Defendants continuously misconstrued the Statute, even in the face of the Ninth Circuit's decision in *Canards*, erroneously claiming that the Statute applies to Interlink's out-of-state internet sales even though *Canards* held the opposite.

75.     As a result of Defendants' unlawful retaliation, Interlink has suffered substantial lost profits, loss of goodwill, and harm to its business reputation, and Interlink is thus entitled to damages for these injuries.

76.     Defendants' harassment campaign towards Interlink, its products, and its retail customers should be declared unlawful retaliation under the First Amendment of the U.S. Constitution, and the Court should enjoin Defendants from continuing to harass Interlink and its retail customers.  The Court should also enjoin Defendants from vindictively interpreting the Statute prior to the 2023 Amendment in direct conflict with *Canards*, and enjoin Defendants from continuing to demand a settlement from Interlink for these pre-2023 sales, and from continuing to threaten Plaintiff with alleged violations associated with the above-described flow-boost kits.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment; Separation of Powers Doctrine)

77.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 76, inclusive, of this Complaint and by reference thereto incorporates the same herein as though set forth in full.

78.     A dispute and actual controversy has arisen and now exists between Interlink and Defendants regarding the applicability of California Public Resources Code section 25402(c)(1)(A)(i), and its accompanying regulations, to Interlink's pre-2023 showerhead sales.

79.     Under the separation of powers doctrine, a legislature or agency's "declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts." *Western Sec. Bank v. Superior Ct.*, 15 Cal.4th 232, 244 (1997).

80.     Before 2023, CEC regulations only applied to appliances "sold or offered for sale in the state."  As the Ninth Circuit held in *Canards*, "sold in California" does not extend to

4511800

16

COMPLAINT

internet sales which occur outside of California and are subsequently shipped into the state. 33 F.4th at 1121–22.

81.     Interlink showerheads purchased online are shipped by common carrier from Interlink's New Jersey warehouse, or other warehouses located outside of California, into California. None of the showerheads at issue in this case shipped from within California. Thus, under *Canards*, title passed outside of California – and Interlink's products were not "sold in the state." Because Interlink's products at issue were sold to California consumers only through the internet, CEC regulations simply did not apply to those products before the 2023 Amendment.

82.     Despite the Ninth Circuit's clear judicial interpretation that "sold in California" does not apply to out-of-state sellers such as Interlink, Defendants continue to incorrectly claim that the 2023 Amendment simply "clarified" existing law, and thus wrongly posits that the Statute always extended to Interlink's sales. Interlink contends this is fundamentally wrong.

83.     Therefore, a judicial declaration is necessary that Public Resources Code section 25402(c)(1)(A)(i)'s 2023 Amendment was a change to California law, not merely a clarification. Because the 2023 Amendment was indeed a change, the CEC regulations did not apply to Interlink's internet sales prior to 2023 as an out-of-state internet seller, and Defendants' attempt to apply these regulations to Interlink's pre-2023 sales is contrary to law.

**THIRD CAUSE OF ACTION**

**(Declaratory Judgment; Flow-Boost Kits)**

84.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 83, inclusive, of this Complaint and by reference thereto incorporates the same herein as though set forth in full.

85.     A dispute and actual controversy has arisen and now exists between Interlink and Defendants regarding whether Interlink showerheads containing 2.5 gpm flow-boost kits violate CEC regulations.

86.     A small number of Interlink's showerheads contain both a pre-installed 1.8 gpm flow restrictor and an optional 2.5 gpm flow restrictor which the consumer has the option to install post-purchase.

DOWNEY BRAND LLP

4511800

17

COMPLAINT

87. On or about May 9, 2024, Defendants alleged these showerheads containing an optional 2.5 gpm flow restrictor violate the Flow Rate Regulation and/or additional CEC regulations. Defendants' logic for this allegation is that, under American Society of Mechanical Engineer ("ASME") testing standards, the flow-boost kit must be installed prior to testing and, because the kit contains a 2.5 gpm flow restrictor, this exceeds the CEC's Flow Rate Regulation. Interlink contends this is fundamentally incorrect, and contrary to federal regulations.

88. ASME compliance testing requires "standard accessories" to be installed prior to compliance testing. An accessory is defined by the ASME as a component that can be added or removed from a "fitting," which ASME defines as "a device that controls and guides the flow of water." A showerhead is defined as the following by ASME: "an accessory to a supply fitting for spraying water onto a bather, typically from an overhead position." Thus, a showerhead is an accessory.

89. A flow-boost kit cannot be an accessory, because an accessory necessarily must attach to a fitting. But a showerhead is not a fitting, so a flow-boost kit cannot be an accessory.

90. Because the flow-boost kit is not an accessory, it would be contrary to law to use the kit to alter an Interlink showerhead for compliance testing – the few Interlink showerheads containing the kit must be tested as-received, with the pre-installed 1.8 gpm flow restrictor. *See* 10 C.F.R. § 429.110(d)(1) ("Prior to and during testing, a test unit selected for enforcement testing shall not be prepared, modified, or adjusted in any manner unless . . . allowed by the applicable DOE test procedure."); *see also* 10 C.F.R. Part 430.32(p) (for showerheads that use a flow restrictor to achieve flow rate compliance, the restrictor must be installed and "mechanically retained" in the showerhead "at the point of manufacture."). These federal regulations directly conflict with Defendants' interpretation of ASME compliance testing requirements.

91. Therefore, a judicial declaration is needed confirming that Interlink's showerheads containing optional 2.5 gpm flow-boost kits do not violate the Flow Rate regulation, nor any other CEC regulations, because compliance testing must be done with the 1.8 gpm flow restrictor left installed.

/ / /

4511800

18

COMPLAINT

Downey Brand LLP

# VII.    PRAYER FOR RELIEF

WHEREFORE, Interlink prays for judgment against Defendants granting it the following relief:

A.    That the Court enter judgment against Defendants in favor of Interlink;

B.    An order granting Interlink declaratory relief pursuant to 28 U.S.C. § 2201 that California Public Resources Code section 25402(c)(1)(A)(i) was inapplicable to Interlink and its products prior to January 1, 2023;

C.    An order granting Interlink declaratory relief pursuant to 28 U.S.C. § 2201 that Interlink's flow-boost kits comply with all applicable CEC regulations;

D.    An order granting Interlink injunctive relief pursuant to 28 U.S.C. § 2202 and pursuant to this Court's inherent authority;

E.    For an award of damages, injunctive and declaratory relief under 42 U.S.C. § 1983;

F.    For an award of attorneys' fees and costs under 28 U.S.C. § 1988 and other applicable law;

G.    For pre-judgment and post-judgment interest; and

H.    For such other relief as this Court deems just and proper.

DATED:  November 18, 2024                DOWNEY BRAND LLP


By:  _/s/ William R. Warne_
WILLIAM R. WARNE
MICHAEL J. THOMAS
Attorneys for Plaintiff INTERLINK PRODUCTS
INTERNATIONAL, INC.

DOWNEY BRAND LLP

4511800

COMPLAINT

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Interlink demands a trial by jury in this action of all issues so triable.

DATED:  November 18, 2024                DOWNEY BRAND LLP


By:    _____*/s/ William R. Warne*_____
                    WILLIAM R. WARNE
                    MICHAEL J. THOMAS
          Attorneys for Plaintiff INTERLINK PRODUCTS
                    INTERNATIONAL, INC.

DOWNEY BRAND LLP

4511800

20

COMPLAINT